UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

---------------------------------------------------------------- x

JERMAINE LEWIS,                                 :
                                                :
                        Plaintiff,              :
                                                :
          v.                                    :          25-CV-1178 (SFR)
                                                :
JESUS GUADARRAMA, *et al*,                      :
                                                :
                        Defendants.             :

---------------------------------------------------------------- x

## <u>INITIAL REVIEW ORDER</u>

Plaintiff Jermaine Lewis, an individual serving a sentence in the custody of the Connecticut Department of Correction ("DOC"),[1] brings a civil rights action, *pro se* and *in forma pauperis*, under 42 U.S.C. § 1983 against eighteen defendants who work at MacDougall-Walker Correctional Institution ("MWCI"): Warden Guadarrama, Deputy Warden Doe, Lieutenant Santiago, Lieutenant Henry Laprey, Correction Officer Gross, Correction Officer Anderson, Correction Officer Santana, Correction Officer Adeyin, Correction Officer Mathews, Correction Officer Zsyk, Lieutenant Cage, Nurse Tony, Mental Health/Social Worker John Doe, Mental Health/Social Worker Jane Doe, Correction Officer John Doe 1, Correction Officer John Doe 2, Correction Officer John Doe 3, and Administrative Remedies Coordinator ("ARC") Walker. He also names as a defendant Cheshire Correctional Institution ("Cheshire C.I.") ARC Becker. Lewis's Complaint suggests violation of his First, Fourteenth

---

[1] I may "take judicial notice of relevant matters of public record." *Giraldo v. Kessler*, 694 F.3d 161, 164 (2d Cir. 2012). A search on the publicly available DOC website under the inmate search function shows that Lewis was sentenced on June 7, 2024, and is now housed at Osborn Correctional Institution.

1

and Eighth Amendment rights during his confinement at MWCI. He sues all defendants in their individual capacities for damages.

The Prison Litigation Reform Act requires that I conduct an initial review of this complaint because Lewis is an incarcerated plaintiff who seeks relief from government employees. 28 U.S.C. § 1915A(a). I have thoroughly reviewed all factual allegations in the Complaint.

## I.   <u>BACKGROUND</u>

I accept as true the following well-pleaded facts in the Complaint. I do not set forth all of the facts alleged in the Complaint but summarize Lewis's basic factual allegations here to give context to its rulings below.

On July 14, 2024, Lewis was involved in a physical altercation with another incarcerated individual, Anthony McCants. Compl. 9, ¶ 1. Lewis sustained a concussion and serious injuries. *Id.* Prior to the altercation, McCants had discussions with Officer John Doe 1, either through verbal conversations or notes being passed through the door. *Id.* at 9, ¶ 2.

Lieutenant Cage secured, detained and videotaped Lewis for his removal from A-Pod to the infirmary. *Id.* at 9, ¶ 3. While Lewis was in the infirmary, Cage attempted to have him press charges against McCants even as he minimized Lewis's claim of self-defense. *Id.* Lewis had a "snarky back and forth" with Cage and "surmi[ses]" that "this was the catalyst for the retaliation [he] was about to endure." *Id.*

Nurse Tony conducted Lewis's initial injury assessment at the infirmary. *Id.* at 9, ¶ 4. Tony recommended that Lewis be seen more thoroughly at UConn Medical, where Lewis was eventually sent for care. *Id.*

2

After the infirmary, Lewis was placed in the Restricted Housing Unit ("RHU"), Cell S09. *Id.* at 10, ¶ 5. Lieutenant Laprey visited Lewis at Cell S09 and tried to "coerce" him to make police report against McCants. *Id.* The Complaint contends that Laprey lied by stating to Lewis that McCants was pressing charges against Lewis with the State Police. *Id.* After Lewis refused to press any charges, Laprey mocked and belittled Lewis by calling him the "Nibbler," which was a reference to Lewis biting McCants during their altercation. *Id.*

Approximately ten or fifteen minutes after his conversation with Laprey, Lewis was again transferred to the prison infirmary, where he was monitored for complications with two fractured ribs. *Id.* at 10, ¶ 6.

The following day, Lewis was served with a disciplinary report, an RHU status order of five days, and two other sanctions. *Id.* From July 14 through July 19, 2024, Lewis completed the disciplinary actions taken against him without issue. *Id.* at 10, ¶ 7.

On the morning of July 19, 2024, Lewis did not contest his confinement because he had seen his medical records and medication being transferred to the Admitting and Processing Room ("A&P Room"). *Id.* at 11, ¶ 8. But after waiting for his transfer to the A&P Room, Lewis observed his medical records and medication being returned. *Id.*

Later in the evening, Lewis stopped Lieutenant Santiago during his tour of the infirmary. *Id.* at 11, ¶ 9. Lewis explained that his "time in the RHU was up" and asked what could be done to "rectify this mishap?" *Id.* Santiago explained that Lewis should "write a grievance and get [his] fucking money." *Id.* Lewis "was still scratching [his] head" about why Santiago would not act on the information that Lewis had completed his time in the RHU. *Id.*

On the morning of July 21, McCants knocked on Lewis's cell window in the infirmary. *Id.* at 11, ¶ 10. McCants apologized to Lewis through the window for his unprovoked and

3

irrational action to attack him. *Id.* McCants questioned the infirmary Correction Officer about why Lewis was still in the RHU while he (McCants) had been released. *Id.*

On July 22, Nurse Tony called a Lieutenant to release Lewis from his "RHU status." *Id.* at 12, ¶ 11. After the withdrawal of his RHU status, Lewis was placed back in the RHU after seeing a doctor. *Id.* Lewis asked Nurse Tony why he was in the RHU again and indicated his opinion that his placement was arbitrary. *Id.* Nurse Tony allegedly answered that "someone fucked up." *Id.*

During his time in the infirmary, Lewis was subjected to a 24-hour lockdown, a shower every three days, and no access to clean underclothing "after the initial 5 days." *Id.* at 12, ¶ 12. Lewis did not have access to pen, paper, his allotted six daily telephone calls, or the mandatory minimum amount of recreation and/or out-of-cell time. *Id.* Lewis recalls that he was the only prisoner in this "post," and he made every correction officer aware that he was not supposed to be in the RHU or under RHU status as of July 19, 2025. *Id.* at 12, ¶ 13.

Correction Officer Santana looked up the date of Lewis's RHU placement and put on a yellow sticky note to his door stating: "Inmate Lewis shouldn't be here and this shouldn't be his status." *Id.* at 13, ¶ 14. Lewis states that this gesture brought tears to his eyes because she "heard" him. Nonetheless, Lewis remained in the RHU. *Id.*

Lewis overheard Correction Officer Gross discussing his part-time work for Door Dash and that he would not be working overtime if Lewis had not been in the RHU infirmary. *Id.* at 13, ¶ 15. Lewis claims that he heard other officers making similar comments such as, "[w]hen he leaves, no one will be here for weeks," or questioning whether their posting to RHU was real. *Id.* at 13, ¶ 16.

4

When Warden Guadarrama and his entourage of Deputy Warden Doe, Doe 2, and Doe 3 toured on several occasions, they did not correct Lewis's situation or check the RHU's log book. *Id.* at 13, ¶ 17. Lewis's anxiety and paranoia increased dramatically. *Id.*

Lewis discussed his fears of being harmed or killed with Correction Officer Anderson. *Id.* at 14, ¶ 18. Officer Anderson expressed her belief that "someone dropped the ball" and tried to assure him that she had no interest in having anything happen to him during her watch. *Id.* Lewis claims he later heard Anderson tell Officer Mathews that she was placed in a situation that her superior knew was not "right." *Id.* After Lewis and Anderson established a rapport, Lewis "humorously" informed her that she would be named in his lawsuit. *Id.*

Lewis also recalls that Officer Zysk was at the RHU post but "failed to act." *Id.* at 14, ¶ 19.

Defendants John and Jane Doe Mental Health/Social Workers had offices just a few feet away from Lewis's cell. *Id.* at 14, ¶ 20. They both ignored and brushed him off whenever he asked for mental health assistance during a mental health crisis. *Id.*

While he was transferring from the infirmary, Lewis spoke to both Jane and John Doe Mental Health/Social Workers about his frustrations with being ignored by both of them and the system in general. *Id.* They apologized and John Doe agreed that "someone dropped the ball." *Id.* Lewis perceived that John Doe put their meeting into the computer. *Id.* Lewis repeatedly asked if John Doe did so because Lewis did not "believe anything that was happening." *Id.* Lewis claims that he either had a "complete disconnect with reality" or "was intentionally being manipulated." *Id.*

Lewis also established a rapport with Officer Adeyin. Adeyin failed to rectify Lewis's situation but did inform others that Lewis's RHU status was wrong. *Id.* at 15, ¶ 21. Lewis

5

claims that Adeyin felt badly about Lewis being "repeatedly mistreated" and volunteered to escort Lewis to the "Traditional RHU" so that he could provide "positive encouragement that things would get better." *Id.*

While confined in "Traditional RHU" cell S05, Lewis stopped Laprey to clarify his situation. *Id.* at 15, ¶ 22. Laprey immediately referred to him as the "Nibbler" and then yelled that the State Police were coming to speak to Lewis about filing charges against McCants. *Id.* Lewis asserts that Laprey's representation was false and that Laprey made a "conscious decision" to put Lewis at risk of harm. *Id.* Lewis refused to continue the conversation with Laprey. *Id.*

Lewis initiated the grievance process by speaking with "Brass, Rank and File" for his attempt at informal resolution of his issues. *Id.* at 16, ¶ 23. After Lewis was ignored on all levels, he attempted to contact his MWCI counselor. *Id.* After 17 days he had received no response and filed a Level 1 Grievance at Cheshire C.I. *Id.* His Level 1 Grievance was denied, and Lewis noticed that MWCI Warden Guadarrama had signed the bottom of his Level 1 Grievance. *Id.* Lewis maintains that the Warden gave a "completely false account for his reasoning" for denying the Level 1 Grievance. *Id.* Lewis filed a Level 2 Grievance Appeal. *Id.*

As Warden Guadarrama was "the initial arbiter of his own Grievance," Lewis alleges that ARC Walker and Becker did not do their due diligence in maintaining the integrity of the Administrative Remedy procedure. *Id.* at 16, ¶ 24. Lewis represents that there was "some '3 Card Molly" paper shuffling." *Id.* at 16, ¶ 25. Lewis maintains that Warden Guadarrama's grievance denial was "written in error," but District Administrator Rodriguez "diligently came to a factual conclusion" for the Level 2 Grievance appeal. *Id.*

## II.   LEGAL STANDARD

Pursuant to 28 U.S.C. § 1915A, courts must review civil complaints in which a prisoner seeks redress from a governmental entity and dismiss any portion that "(1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or (2) seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b)(1)-(2).

Although highly detailed allegations are not required, the complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. This plausibility standard is not a "probability requirement" but imposes a standard higher than "a sheer possibility that a defendant has acted unlawfully." *Id.*

In undertaking this analysis, the court must "draw all reasonable inferences in [a plaintiff's] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber v. Metro Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted). But the court is not "bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions," *id.*, and "a formulaic recitation of the elements of a cause of action will not do," *Iqbal*, 556 U.S. at 678.

With respect to *pro se* litigants, it is well-established that "[p]ro se submissions are reviewed with special solicitude, and 'must be construed liberally and interpreted to raise the strongest arguments that they suggest.'" *Matheson v. Deutsche Bank Nat'l Tr. Co.*, 706 F.

7

App'x 24, 26 (2d Cir. 2017) (summary order) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474-75 (2d Cir. 2006) (per curiam)).

III.    **DISCUSSION**

Lewis advances claims of retaliation in violation of the First Amendment, Eighth Amendment claims related to his time in the RHU, and claims under the procedural due process clause of the Fourteenth Amendment. All claims are brought pursuant to 42 U.S.C. § 1983.

Section 1983 "provides a private right of action against any person who, acting under color of state law, causes another person to be subjected to the deprivation of rights under the Constitution or federal law." *Blyden v. Mancusi*, 186 F.3d 252, 264 (2d Cir. 1999). "The common elements to all § 1983 claims are: '(1) the conduct complained of must have been committed by a person acting under color of state law; and (2) the conduct complained of must have deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States.'" *Lee v. City of Troy*, 520 F. Supp. 3d 191, 205 (N.D.N.Y. 2021) (quoting *Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994)).

A plaintiff seeking monetary damages from a defendant must allege facts that establish the personal involvement of that defendant in the alleged constitutional violation. *See Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (stating that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983"). This is true with respect to supervisory officials as well. *Tangreti v. Bachman*, 983 F.3d 609, 620 (2d Cir. 2020) ("[T]he plaintiff must directly plead and prove that each Government-official defendant, through the official's own individual actions, has violated the Constitution.") (citation and internal quotation marks omitted).

8

### A.    First Amendment Retaliation

The Second Circuit has "instructed district courts to 'approach prisoner retaliation claims with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.'" *Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015) (quoting *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003)).

The elements of a First Amendment retaliation claim are "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Brandon v. Kinter*, 938 F.3d 21, 40 (2d Cir. 2019) (quoting *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004)) (internal quotation marks omitted).

Lewis maintains that he was retained in the RHU beyond the period set forth for his disciplinary offense as retaliation for his refusal to file a police report against McCants. *See* Compl. 9, ¶ 3; *see also id.* at 18. He seeks to hold Lieutenant Cage, Nurse Tony, Lieutenant Santiago, Lieutenant Laprey, Warden Guadarrama, Doe 2 and 3, and Correction Officers Santana, Gross, Anderson, Adeyin, and Zsyk liable for First Amendment retaliation.

The Second Circuit has held that held "that inmates generally retain a First Amendment interest in declining to speak." *See Burns v. Martuscello*, 890 F.3d 77, 88 (2d Cir. 2018). Accordingly, I assume for purposes of initial review that Lewis's decision not to file a police report is entitled to First Amendment protection.

As to the second element, "[o]nly retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights

9

constitutes an adverse action for a claim of retaliation." *Davis*, 320 F.3d at 353 (quoting *Dawes v. Walker*, 239 F.3d 489, 493 (2d Cir. 2001) (internal quotation marks omitted). At this early stage in the proceeding, Lewis's extended RHU confinement beyond the period imposed for his disciplinary offense supports a claim of adverse action. *See Grinvalsky v. Cartwright*, No. 3:23-CV-797 (OAW), 2025 WL 2719533, at *4 (D. Conn. Sept. 24, 2025) (stating that "an inmate of ordinary firmness might forego advocating for themselves to avoid unpleasantness and threats in housing"). In addition, Lewis may have also suffered adverse action as a result of Lieutenant Laprey yelling that the state police were about to arrive for him to make a police report as such conduct may have caused other prisoners to consider Lewis to be a prison informant or snitch. *See Burns*, 890 F.3d at 91 (noting a prisoner may suffer from violence after being labeled as a snitch).

As for the third element, a plaintiff can establish a causal connection to suggest retaliatory intent by showing that his protected activity was close in time to the complained-of adverse action. *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2001) (citations omitted). Lewis's allegations indicate that he suffered the adverse action by Lieutenants Cage and Laprey soon after he declined to make a police report against McCants. Compl. 9, ¶ 3; *see also id.* at 10, ¶ 5.

I therefore permit Lewis to proceed on First Amendment retaliation claims for damages against Lieutenant Cage and Lieutenant Laprey. But I dismiss Lewis's claims against Nurse Tony, Lieutenant Santiago, Warden Guadarrama, Doe 2 and 3, and Correction Officers Santana, Gross, Anderson, Adeyin, and Zsyk, who are not alleged to have been aware of Lewis's refusal to report McCants to the state police. *See Schlosser v. Manuel*, No. 3:19-CV-

1444 (SRU), 2020 WL 127700, at *4 (D. Conn. Jan. 10, 2020) (dismissing retaliation claims where plaintiff had not alleged that the defendant was aware of his protected activity).

### B.      Other Claims Related to Delayed Release from RHU

The Complaint states that Lewis should have been released from the RHU no later than July 19, 2025. Compl. 12, ¶ 13. But despite his efforts to alert prison officials, Lewis remained in the RHU at least through July 22, 2025. *Id.* at 12, ¶ 11. I consider whether Lewis can state plausible claims related to the time he was held in RHU past July 19, 2025. This allegation supports a claim under the Eighth Amendment as well as under the Procedural Due Process Clause of the Fourteenth Amendment.

#### 1.      Eighth Amendment: Delayed Release from RHU Without Penological Purpose

"Confinement in a prison or in an isolation cell is a form of punishment subject to scrutiny under Eighth Amendment standards." *Hutto v. Finney*, 437 U.S. 678, 685 (1978). "The unnecessary and wanton infliction of pain constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Hope v. Pelzer*, 536 U.S. 730, 737 (2002) (citation and internal quotation marks omitted; alterations adopted). "We have said that '[a]mong 'unnecessary and wanton' inflictions of pain are those that are 'totally without penological justification.'" *Id.* (quoting *Rhodes v. Chapman*, 452 U.S. 337, 346 (1980)). Defendants may therefore be liable under the Eighth Amendment because the Complaint plausibly alleges that Lewis was held in RHU past July 19, 2025 without any legitimate penological purpose.[2] *See,*

---

[2] "Because of a general reluctance 'to expand the concept of substantive due process,' '[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *H'Shaka v. O'Gorman*,

11

*e.g.*, *H'Shaka v. O'Gorman*, 444 F. Supp. 3d 355, 378 (N.D.N.Y. 2020) (concluding that there was "a genuine dispute of material fact as to whether the DOCCS Defendants had a legitimate penological justification for retaining Plaintiff in Ad Seg"); *Grenning v. Miller-Stout*, 739 F.3d 1235, 1240 (9th Cir. 2014) ("The existence of a legitimate penological justification has . . . been used in considering whether adverse treatment is sufficiently gratuitous to constitute punishment for Eighth Amendment purposes."); *Porter v. Clarke*, 923 F.3d 348, 362 (4th Cir. 2019), *as amended* (May 6, 2019) ("[I]f a prison official lacks a legitimate penological justification for subjecting an inmate to a condition of confinement that poses a substantial risk of serious harm . . . then the official is presumptively acting with deliberate indifference to that risk."); *Thomas v. Bryant*, 614 F.3d 1288, 1311 (11th Cir. 2010) (stating that "where chemical agents are used unnecessarily, without penological justification, or for the very purpose of punishment or harm, that use satisfies the Eighth Amendment's objective harm requirement"). Accordingly, for purposes of initial review, I conclude the Complaint plausibly supports the inference that the same Defendants implicated in his procedural protection claim, discussed further below, are liable for this claim under the Eighth Amendment. These Defendants include Lieutenant Cage, Nurse Tony, Warden Guadarrama, and Deputy Warden Doe.

### 2.    Procedural Due Process

I construe these same factual circumstances to support claims under the Procedural Due Process Clause of the Fourteenth Amendment. "[T]he Due Process Clause provides that certain

---

444 F. Supp. 3d 355, 371 (N.D.N.Y. 2020) (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 842 (1998)). The Complaint makes clear that Lewis was serving a sentence of imprisonment at the time he was in the RHU. *See* Compl. 10, ¶ 7 (stating that Lewis was disciplined on July 14, 2024); *supra* n.1 (taking judicial notice that Lewis was sentenced on June 7, 2024). I therefore analyze his claims only under the rubric of the Eighth Amendment rather than under the substantive due process clause of the Fourteenth Amendment.

12

substantive rights—life, liberty, and property—cannot be deprived except pursuant to constitutionally adequate procedures." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985). "To prevail on a procedural due process claim, a plaintiff must demonstrate that Defendants 'deprived him of a cognizable interest in life, liberty, or property,' and that they did so 'without affording him constitutionally sufficient process.'" *Walker v. Bellnier*, 146 F.4th 228, 251 (2d Cir. 2025) (quoting *Proctor v. LeClaire*, 846 F.3d 597, 608 (2d Cir. 2017)). For purposes of initial review, I conclude that Lewis may proceed to service on claims that Defendants (1) failed to offer procedural protections in service of his protected liberty interests and (2) failed to conduct a periodic review of his placement in the RHU.

### a.    Procedural Protection

The Due Process Clause, standing alone, generally does not create a protected liberty interest in conditions of confinement so long as the conditions are "within the normal limits or range of custody which the conviction has authorized the State to impose." *Meachum v. Fano*, 427 U.S. 215, 225 (1976). In *Sandin v. Conner*, 515 U.S. 472 (1995), the Supreme Court held that a liberty interest warranting due process protection "will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force . . . nonetheless imposes an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 484. There is no bright line rule that a specific period of segregated confinement "automatically fails to implicate due process rights." *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004) (stating that "harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical").

For purposes of initial review, I assume that retaining Lewis in the severely restrictive infirmary past the date required for his disciplinary sanctions and then transferring him to the RHU for continuing restrictive confinement constitutes an atypical and significant hardship entitled to procedural protection.

The level of procedural protection required depends on the purpose of the hearing. *Bolden v. Alston*, 810 F.2d 353, 357 (2d Cir. 1987). If the conditions were imposed for punitive or disciplinary reasons, an individual is entitled to advance written notice of the charge, adequate time to prepare a defense, a written statement of the reasons for the disciplinary action taken, and a limited opportunity to present witnesses and evidence in his defense. *Wolff v. McDonnell*, 418 U.S. 539, 561-70 (1974). An individual placed in administrative segregation must receive notice of why he is being placed there and an opportunity to respond. *Proctor*, 846 F.3d at 609 (citing *Hewitt v. Helms*, 459 U.S. 460, 476 (1983)). Decisions to place a person in administrative or punitive segregation must also be supported by some evidence. *Brown v. Semple*, No. 3:16CV376 (MPS), 2018 WL 4308564, at *12 (D. Conn. Sept. 10, 2018) (observing that procedural due process requires that decision in connection with prison disciplinary hearing be "supported by some evidence in the record") (quoting *Superintendent v. Hill*, 472 U.S. 445, 454 (1985). The Second Circuit has explained that a disciplinary determination must be supported by some "reliable evidence" of guilt. *Elder v. McCarthy*, 967 F.3d 113, 129 (2d Cir. 2020) (quoting *Luna v. Pico*, 356 F.3d 481, 488 (2d Cir. 2004)).

Regardless of whether Lewis's continued restrictive confinement should be characterized as administrative or punitive, Lewis's allegations support an inference that he was not afforded the procedural protections required under either *Hewitt* or *Wolff*. Thus, I permit Lewis to proceed on Fourteenth Amendment procedural due process claims against

14

Lieutenant Cage (whom the Complaint identifies as being involved with Lewis's RHU placement); Nurse Tony (whom the Complaint describes as responsible Lewis's continued RHU placement); and Warden Guadarrama and Deputy Warden Doe (whom Lewis says were aware of Lewis's continued RHU confinement and could have afforded him procedural protections).

The Complaint alleges that Santiago, John Does 2 and 3, and Correction Officers Santana, Gross, Anderson, Mathews, Adeyin, and Zsyk failed to act despite being aware of his continued restrictive confinement. But the Complaint fails to support an inference that any of these defendants had the capacity but failed to afford Lewis procedural protection for his continued RHU confinement.

### b.      Periodic Reviews

I also read the Complaint to raise a procedural due process claim based on lack of periodic reviews of RHU confinement. Once a prisoner has been confined to administrative segregation, officials must engage in periodic review to assess whether the prisoner remains a security risk. *See Walker*, 146 F.4th at 252 ("[T]he Due Process Clause requires meaningful periodic review of an incarcerated person's Ad Seg status."); *Proctor*, 846 F.3d at 614 ("Once an inmate has been confined in Ad Seg, *Hewitt* mandates that prison officials 'engage in some sort of periodic review of the confinement' to verify that the inmate 'remains a security risk' throughout his term.") (quoting *Hewitt*, 459 U.S. at 477 n.9).

For initial review purposes, I permit Lewis to proceed on his Fourteenth Amendment procedural due process claim based on the lack of periodic reviews of his restrictive confinement against Warden Guadarrama and Deputy Warden Doe in their individual capacities.

### C.    Eighth Amendment Deliberate Indifference to Lewis's Safety

In the context of an incarcerated plaintiff's claim related to their conditions of confinement, those conditions that are "restrictive or even harsh" do not violate the Eighth Amendment because "they are part of the penalty that criminal offenders pay for their offenses against society." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). Although the Constitution does not require "comfortable" prison conditions, it does not permit prison officials to maintain conditions that inflict "unnecessary and wanton pain" or result in the "serious deprivation of basic human needs" or the "minimal civilized measure of life's necessities." *Id*. at 347, 349.

A successful claim of deliberate indifference to health or safety due to unconstitutional conditions of confinement requires an individual to satisfy both an objective and a subjective element. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To meet the objective element, the incarcerated plaintiff must established that he was incarcerated under a condition or a combination of conditions that resulted in a "sufficiently serious" deprivation of a life necessity or a "human need[ ]" or posed "a substantial risk of serious harm" to his health or safety. *Id*.; *see also Rhodes*, 452 U.S. at 347. "The Supreme Court has identified the following basic human needs or life necessities of an inmate: food, clothing, shelter, medical care, warmth, safety, sanitary living conditions, and exercise." *Baltas v. Erfe*, No. 3:19CV1820 (MPS), 2020 WL 1915017, at *24 (D. Conn. Apr. 20, 2020) (citing *Wilson v. Seiter*, 501 U.S. 294, 304 (1991); *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs*., 489 U.S. 189, 200 (1989); *Rhodes*, 452 U.S. at 348). Conditions may be considered in the aggregate "only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise." *Wilson*, 501 U.S. at 304; *see also id.* (noting that "low cell temperature at night combined with a failure to issue blankets" may establish an Eighth

Amendment violation). "[T]here is no static test to determine whether a deprivation is sufficiently serious; the conditions themselves must be evaluated in light of contemporary standards of decency." *Jabbar v. Fischer*, 683 F.3d 54, 57 (2d Cir. 2012) (citation and internal quotation marks omitted).

To meet the subjective element, an individual must show that the defendants possessed culpable intent; that is, they knew that the plaintiff faced a substantial risk to his health or safety and yet they disregarded that risk by failing to take corrective action. *See Farmer*, 511 U.S. at 834, 837. Thus, an allegation of "mere negligen[t]" conduct is insufficient. *Id.* at 835. Rather, the subjective element requires that the individual contend that the defendants acted with "a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006).

### 1.    Eighth Amendment Failure to Protect from Attack by McCants

Prison officials have a duty to take reasonable measures to protect incarcerated individuals from violence inflicted by others. *Farmer*, 511 U.S. at 833; *see also Walker v. Schult*, 717 F.3d 119, 128 (2d Cir. 2013). To state an Eighth Amendment claim for failure to protect from another incarcerated individual, the plaintiff must show that (1) the defendant "had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer did not take reasonable steps to intervene." *Ryan v. Bell*, No. 20CV602GLSDJS, 2024 WL 36591, at *3 (N.D.N.Y. Jan. 3, 2024) (citation and alteration omitted); *see also Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) ("In order for liability to attach, there must have been a realistic opportunity to intervene to prevent the harm from occurring.") (citation omitted).

Lewis claims that Officer John Doe acted with deliberate indifference to Lewis's risk of harm from McCants, who attacked Lewis on July 14, 2024. Compl. 18, ¶ 1. The Complaint says that on the prior night, McCants complained to Officer Doe about Lewis, "either through conversations or notes being passed through the door." *Id.* at 9, ¶ 2. Although thin, these allegations are sufficient for purposes of initial review to support the inference that Officer Doe had advance warning that McCants posed a substantial danger to Lewis and that he could have intervened to prevent an attack but nonetheless failed to take action. *See Fleming v. United States*, 146 F.3d 88, 90 (2d Cir. 1998) (stating that cases brought by pro se plaintiffs must be reviewed "with a lenient eye, allowing borderline cases to proceed").

### 2.    Verbal Harassment

Lewis complains that Lieutenant Laprey mocked and belittled him by calling him the "Nibbler." *See* Compl. 10, ¶ 5. But he does not allege any facts to suggest this name calling caused some "appreciable injury." *See Willey v. Kirkpatrick*, 801 F.3d 51, 70 (2d Cir. 2015); *Robbs v. DeCapua*, No. 3:25-CV-74 (SVN), 2025 WL 1529317, at *3 (D. Conn. May 29, 2025) (stating that verbal harassment alone does not rise to the level of a constitutional violation but observing that "some courts have held that where verbal harassment caused psychological injury 'as a form of punishment,'" that may constitute a constitutional violation). Given the facts alleged here, I dismiss Lewis's Eighth Amendment claim against Laprey arising from this name calling.

Lewis also asserts that Laprey yelled for other prisoners to hear that the state police were arriving so that Lewis could make his police report about McCants. Compl. 15, ¶ 22. I construe Lewis to assert that Laprey sought to endanger Lewis by implying that Lewis was a prison informant or snitch. For purposes of initial review, I find that Lewis has sufficiently

alleged Laprey acted to endanger him in violation of the Eighth Amendment. *See Burns v. Martuscello*, 890 F.3d 77, 91 (2d Cir. 2018) (observing that "a number of courts have found an Eighth Amendment violation where a guard publicly labels an inmate as a snitch, because of the likelihood that the inmate will suffer great violence at the hands of fellow prisoners"). Accordingly, Lewis may proceed for damages against Laprey for Eighth Amendment indifference to Lewis's safety.

### 3.    Conditions

Lewis maintains that while in the RHU infirmary, he was subjected to a 24-hour lockdown, a shower every three days, and no access to clean underclothing for the first five days, and that he was deprived of the minimum amount of recreation and out-of-cell time, his allotted amount of telephone calls, and access to paper and pen. Compl. 12, ¶ 12.[3] I consider whether Lewis has alleged any plausible Eighth Amendment deprivations arising from his unsanitary and isolating conditions and lack of exercise.

### a.    Hygiene

Prisoners have a right to sanitary living conditions and the necessary materials to maintain adequate personal hygiene. *See Walker v. Schult*, 717 F.3d 119, 127 (2d Cir. 2013). The Second Circuit requires that "unsanitary conditions of confinement must be assessed according to two components, severity and duration, on a case-by-case basis." *Darnell v. Pineiro*, 849 F.3d 17, 30 (2d Cir. 2017) (citing *Willey*, 801 F.3d at 68). In considering the severity of a condition, the court considers "its qualitative offense to a prisoner's dignity." *Id*.

---

[3] Lewis has not alleged serious deprivations of any basic human need arising from restriction on his telephone calls or access to writing materials. *See, e.g., Trimmier v. Cook*, No. 3:20-CV-396 (KAD), 2020 WL 5231300, at *5 (D. Conn. Sept. 2, 2020).

at 31 (citation and internal quotation marks omitted). "[C]ourts in this Circuit have held that temporary denials of access to a shower for up to two weeks typically do not satisfy the objective prong of an Eighth Amendment deliberate indifference claim." *Carolina v. Feder*, No. 3:20-CV-658 (SRU), 2021 WL 268854, at *8 (D. Conn. Jan. 26, 2021).

Lewis has not alleged facts to suggest that a shower every three days prevented him from maintaining his personal hygiene. *See, e.g.*, *Bernier v. Sweet*, No. 15-CV-209 (RJA) (HBS), 2018 WL 1047103, at *3 (W.D.N.Y. Feb. 26, 2018) (two showers per week did not constitute sufficient deprivation under Eighth Amendment).

And even if Lewis's lack of clean undergarments could satisfy the Eighth Amendment's objective element, Lewis has not alleged facts to satisfy the subjective element. No facts suggest that any defendant was aware that he had not been provided with clean undergarments after his initial five days in the infirmary. Accordingly, Lewis may not proceed on any Eighth Amendment claims arising from unsanitary conditions.

### b.    Isolation

Lewis's allegations suggest that he was subjected to isolating conditions while confined in the RHU infirmary. Courts have found that prolonged periods of isolation or solitary confinement can sometimes constitute cruel and unusual punishment under the Eighth Amendment. *Conley v. Aldi*, No. 3:18-CV-00824 (VAB), 2020 WL 1333501, at *6 (D. Conn. Mar. 23, 2020) (collecting cases); *see Porter v. Clarke*, 923 F.3d 348, 353 (4th Cir. 2019), *as amended* (May 6, 2019) ("The challenged conditions of confinement on Virginia's death row—under which Plaintiffs spent, for years, between 23 and 24 hours a day alone, in a small . . . cell with no access to congregate religious, educational, or social programming—pose a substantial risk of serious psychological and emotional harm.").

20

As I explain above, the Complaint states a claim under the Eighth Amendment insofar as it alleges Lewis was held in RHU beyond his release date of July 19, 2024 without penological purpose. But for the purposes of his conditions of confinement claim, Lewis must allege that his time in RHU posed a substantial risk of serious psychological and emotional harm. Although the Complaint suggests that the time in RHU came at the expense of his mental health, it does not appear that Lewis's time in RHU rose to the level of isolation as to state a claim under the Eighth Amendment. *Cf. Paschal-Barros v. Quiros*, No. 3:21-CV-00698 (SALM), 2022 WL 124544, at *5 (D. Conn. Jan. 13, 2022) (concluding that plaintiff's allegations of confinement in "near total isolation for approximately five years" resulting "in [his] deteriorating mental health" satisfied the Eighth Amendment objective element).

### c.    Exercise

Exercise is an essential human need protected by the Eighth Amendment. *See Wilson v. Seiter*, 501 U.S. 294, 304-05 (1991). Prison officials may, however, limit the right to out-of-cell exercise where there is a valid safety exception or certain unusual circumstances. *Williams v. Greifinger*, 97 F.3d 699, 704 (2d Cir. 1996). A lack of indoor exercise and an "occasional day without exercise" does not give rise to a constitutional claim where "outdoor recreation space [is] provided and opportunity for its daily use [is] assured." *Anderson v. Coughlin*, 757 F.2d 33, 36 (2d Cir. 1985).

Lewis alleges that he was subjected to twenty-four-hour lockdowns and afforded a minimal level of exercise, recreation and/or out-of-cell time while in the RHU infirmary. For initial pleading purposes, these allegations are sufficient to support an inference of an Eighth Amendment deprivation. Accordingly, I permit Lewis to proceed on Eighth Amendment damages claims arising from inadequate opportunity for exercise, recreation and/or out-of-cell

time against Warden Guadarrama and Deputy Warden Doe, who plausibly were aware of these conditions at the MWCI RHU infirmary.

### D.    Eighth Amendment Deliberate Indifference to Mental Health Needs

The Eighth Amendment prohibits both deliberate indifference to serious medical and mental health needs of prisoners. *Spavone v. New York State Dep't of Corr. Servs*., 719 F.3d 127, 138 (2d Cir. 2013). To state a claim for deliberate indifference to medical treatment, the incarcerated plaintiff must show that "(1) objectively, the alleged deprivation of medical care was 'sufficiently serious,' and (2) subjectively, that the defendants acted or failed to act 'while actually aware of a substantial risk that serious inmate harm will result.'" *Washington v. Artus*, 708 F. App'x 705, 708 (2d Cir. 2017) (summary order) (quoting *Salahuddin*, 467 F.3d at 279-80).

Lewis sufficiently alleges that John and Jane Doe Mental Health/Social Workers ignored his serious mental health treatment needs. *See Compl.* ¶ 20. Thus, I will permit Lewis to proceed on his Eighth Amendment mental health deliberate indifference claims against Jane and John Does in their individual capacities.

### E.    Administrative Directives and Grievance Procedures

Lewis contends that ARC Becker and Walker violated his Fourteenth Amendment rights by not "maintaining the integrity of the Administrative Remedies procedure" for his grievance review. Compl. 16, ¶ 24. Lewis also maintains that several defendants violated the prison directives. *Id*. at 19, ¶¶ 3-5; *see also id.* at 20, ¶¶ 6-7.

"It is well-established that inmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures do[ ] not give rise to a cognizable § 1983 claim." *Brown v. Ruiz*, No. 3:18-CV-

22

1235 (JAM), 2019 WL 1533438, at *3 (D. Conn. Apr. 9, 2019) (internal quotation marks and citations omitted); *see also Davis v. Rinaldi*, No. 3:19-cv-504 (CSH), 2019 WL 7879729, at *7 (D. Conn. Oct. 31, 2019) ("Plaintiff does not have a protected liberty interest in having correctional officials investigate his complaints, through the grievance process or otherwise."); *Tafari v. McCarthy*, 714 F. Supp. 2d 317, 347 (N.D.N.Y. 2010) ("[P]risoners do not have a due process right to a thorough investigation of grievances.") (citing *Torres v. Mazzuca*, 246 F. Supp. 2d 334, 341-42 (S.D.N.Y. 2003)).

Likewise, "allegations that a prison official violated the procedures set forth" in an Administrative Directive or other policy "do not state a claim of a violation of an inmate's constitutional rights." *Olivencia v. Pun*, No. 3:21CV00739 (KAD), 2021 WL 3173137, at *4 (D. Conn. July 27, 2021) (citing *Swift v. Tweddell*, 582 F. Supp. 2d 437, 445-46 (W.D.N.Y. 2008)). Accordingly, any claim based on an insufficient grievance review or administrative directive violation must be dismissed.

## IV.   **CONCLUSION AND ORDERS:**

For the foregoing reasons, I conclude that Lewis may proceed on the following claims:

(1) First Amendment retaliation claim against Lieutenants Cage and Laprey;

(2) Fourteenth Amendment procedural due process violation against Lieutenant Cage, Lieutenant Laprey, Nurse Tony, Warden Guadarrama, and Deputy Warden Doe for extending Lewis's restrictive confinement without procedural protection;

(3) Fourteenth Amendment procedural due process violation against Warden Guadarrama and Deputy Warden Doe for retaining Lewis in restrictive confinement without periodic review;

(4) Eighth Amendment claim against Lieutenant Cage, Lieutenant Laprey, Nurse Tony, Warden Guadarrama, and Deputy Warden Doe for extending Lewis's time in RHU without penological purpose;

(5) Eighth Amendment violation against Lieutenant Laprey for deliberate indifference to Lewis's safety;

(6) Eighth Amendment violation for deliberate indifference to his exercise, recreation and/or out-of-cell time deprivation against Warden Guadarrama and Deputy Warden Doe;

(7) Eighth Amendment violation against Officer Doe for failure to protect Lewis from the attack by McCants;

(8) Eighth Amendment violation against Mental Health/Social Workers Jane and John Doe for deliberate indifference to Lewis's mental health treatment needs.

All other claims are **DISMISSED WITHOUT PREJUDICE**.

**Lewis has two options as to how to proceed in response to this Initial Review Order**:

(1) If Cook wishes to proceed immediately only on the claims set forth above, he may do so without further delay. If Lewis selects this option, he shall file a notice on the docket on or before May 22, 2026 informing the court that he elects to proceed with service as to the claims set forth in this paragraph. The court will then begin the effort to serve process in the capacity described above.

(2) Alternatively, if Lewis wishes to attempt to replead any of the claims asserted in his complaint that have been dismissed in order to attempt to state a viable claim, he may file an amended complaint on or before May 22, 2026. An

24

amended complaint, if filed, will completely replace the complaint, and the court will not consider any allegations made in the original complaint in evaluating any amended complaint. The court will review any amended complaint after filing to determine whether it may proceed to service of process on any defendants named therein. If Lewis elects to file an amended complaint, the complaint addressed by this Initial Review Order will not proceed to service of process on any defendant.

If the court receives no response from Cook before May 22, 2026, the court will presume that Lewis wishes to proceed on the complaint as to the claims permitted to go forward in this Initial Review Order, and he will have to show good cause if he seeks to amend the complaint in any manner in the future.

**Changes of Address**. If Lewis changes his address at any time during the litigation of this case, Local Rule 83.1(c) provides that he **MUST** notify the court. Failure to do so may result in the dismissal of the case. He must give notice of a new address even if he is incarcerated. Lewis should write PLEASE NOTE MY NEW ADDRESS on the notice. It is not enough to just put the new address on a letter without indicating that it is a new address. If Lewis has more than one pending case, he should indicate all the case numbers in the notification of change of address. Lewis should also notify Defendants or counsel for Defendants of his new address.

**SO ORDERED.**

New Haven, Connecticut
April 21, 2026

/s/*Sarah F. Russell*
SARAH F. RUSSELL
United States District Judge